BROADWAY PROPERTIES, INC., APPELLANT, *v.* CROUCH, DIR., DEPT. OF LIQUOR CONTROL, APPELLEE.

(No. 6538—Decided June 27, 1961.)

*Messrs. Vorys, Sater, Seymour & Pease, Mr. Russell P. Herrold, Jr., Messrs. Squire, Sanders & Dempsey, Mr. James C. Davis* and *Mr. George I. Meisel,* for appellant.

*Mr. Mark McElroy,* attorney general, and *Mr. Theodore R. Saker,* for appellee.

BRYANT, J. This is an appeal on questions of law and fact. Broadway Properties, Inc., an Ohio corporation, herein called Broadway, with its principal office in Cleveland, Ohio, appellant herein, was plaintiff in the court below, and Richard C. Crouch, Director of the Ohio Department of Liquor Control, appellee herein, was defendant in the court below. The petition of plaintiff alleges that Broadway is an Ohio corporation and that Crouch is Director of the Ohio Department of Liquor Control empowered to contract for warehouse space and service to store state-owned liquor and for space for a wholesale store. The petition alleges also that Broadway operates a warehouse at 6114 Broadway Avenue in Cleveland, and since June 1, 1958,

has provided such warehouse and wholesale store space for the Cleveland district; that prior to 1958 the contract for such service for a period of 25 years was held by the Otis Terminal Warehouse located at 1300 West Ninth Street, Cleveland, Ohio; that Otis is a division of Gera Corp., a New Jersey corporation, which in turn is a subsidiary of Glen Alden Corporation, a New York corporation; and that Cleveland Arcade Corp. is lessor of the warehouse property located at 1300 West Ninth Street, Cleveland, Ohio, to Otis.

The petition alleges that Albert A. List is the chairman, president and chief executive officer of Glen Alden Corp. and Gera Corp. and a principal shareholder of Cleveland Arcade Corp., that Bernard E. Woeste is vice president of Glen Alden Corporation and general manager of Otis, and that Ellick B. Wasserman is general manager of Cleveland Arcade Corp.

The petition alleges that Otis (now a division of Gera), Glen Alden, Gera and Cleveland Arcade Corporation, List, Woeste, Wasserman and other unnamed officers, agents and employees of the named corporations and divisions "engaged in a conspiracy against trade in violation of Ohio Revised Code Sections 1331.01 through 1331.99, known as the Valentine Act, and in a combination and conspiracy in restraint of trade and commerce and to monoplize a part of trade and commerce in violation of Sections 1 and 2 of the Sherman Anti-Trust Act of the United States (15 U. S. Code, Sections 1 and 2), by conspiring and combining to put plaintiff out of this warehousing business and to destroy its ability to compete with Otis for the Cleveland District Department of Liquor Control warehousing contracts."

The petition alleges that the Department of Liquor Control invited bids for the furnishing of warehouse and wholesale store space for the Cleveland district for the period of three years beginning June 1, 1960; and that Otis on March 15, 1960, submitted a bid "which was substantially below cost, was not a competitive bid and was submitted for the purpose of driving plaintiff out of this business and to re-establish Otis' twenty-five (25) year control of the Cleveland district warehousing business."

Referring to a stipulation in the record it appears that the department asked for quotations for (1) in and out service and

first month storage and (2) charge per month for storage after the first month, referred to herein as (1) initial charge and (2) renewal charge. It appears that Broadway's bid per case stored was as follows: (1) initial charge, $.1245 per case, and (2) renewal, $.055 per case. While Otis' bid per case stored was as follows: (1) initial charge, $.095 per case, and (2) renewal, $.03 per case.

The petition alleges that the "predatory, monopolistic bid of Otis of 9.5 cents per case of spirituous liquor to be stored in the Cleveland district warehouse was lower than any charge it had made to the state for this warehousing service" in the 15-year period prior to 1958; that Crouch will award the bid to Otis "solely because it is the low bidder"; and that awarding the contract to Otis "will aid and abet the predatory, monopolistic combination and conspiracy" of Otis, Glen Alden, Gera, Cleveland Arcade Corp., List, Woeste, Wasserman and others.

There are also allegations in the petition with reference to (1) amounts spent by Broadway to improve its property and adapt it for use as a liquor warehouse and (2) the superiority of Broadway's warehouse and the defects and deficiencies in Otis' warehouse, which we do not consider properly within an action of this sort for the reasons which follow.

Broadway does not and could not base any claim for a new contract upon its additional capital investment made during the two-year life of its 1958 contract.

On June 2, 1959, in the case of *Canton Storage, Inc.,* v. *Moon, Dir.,* 110 Ohio App., 7, this court held that the Director of the Department of Liquor Control "is not required by statute to let a contract for warehouse space pursuant to competitive bidding." The case further decided that in letting the contract for warehouse space, such director "is free to exercise his own discretion," in the absence of fraud or abuse of discretion. It would appear that the director has uncontrolled discretion, as the petition nowhere alleges that any act of the director constitutes either fraud or abuse of discretion. We conclude therefore that questions relating to the comparative merits of the two warehouses, the question of Broadway's additional investment and the desirability of the two locations are not properly before us.

The petition alleges also that, if the warehouse contract

is awarded to Otis, Broadway will suffer "irreparable harm and damage" and that it has no other adequate remedy at law. The prayer of the petition is as follows:

"Wherefore, plaintiff prays for an order of the court enjoining the defendant from awarding, letting, signing, executing or entering into any contract with Otis Terminal Warehouse Division, Glen Alden Corporation, Gera Corporation, or any of them, for the Cleveland district warehouse and wholesale store and for such other relief as it may be entitled to, and for its costs herein."

An answer was filed on behalf of Crouch as Director of Liquor Control. It admits (a) the corporate capacity of Broadway; (b) that Crouch has the authority to enter into warehouse leases and contracts for wholesale store space; (c) that for two years Broadway has had the contract for the Cleveland District Warehouse and Wholesale Liquor Store; (d) that Otis, a division of Gera Corporation, operates a warehouse at 1300 West Ninth Street, Cleveland, Ohio; (e) that Cleveland Arcade Corporation and others lease the warehouse to Otis; and (f) that List and Woeste hold the offices alleged in the petition. The answer admits also that invitations for sealed bids were issued on February 11, 1960, for the Cleveland District Warehouse and Wholesale Store and that Broadway and Otis submitted the following bids:

| "Broadway Properties, Inc. | | Otis | |
|---|---|---|---|
| "Unloading | $0.025 | $0.02 | |
| Inspection | .00 | .00 | |
| Placing in Storage | .0095 per case | .01 per case | |
| Handling Out | .03 " " | .03 " " | |
| First Month's Storage | .055 | .035 | |
| Reporting Serial Numbers | .005 " " | .00 " " | |
| Totals | $0.1245 per case | $0.095 per case | |
| Renewal Storage per month | .055 | .03 | |
| Recoopering | .50 | .50 | |
| Wholesale Storage | .648 per sq. ft. | .69 per sq. ft. | |
| General Labor Charges | 3.00 per hour | 3.00 per hour" | |

34

The answer denies "for want of knowledge" the allegations of the petition as to a conspiracy between Gera and the other corporations, and List and the other officials; that Otis' bid was substantially below cost and not a competitive bid; and that such bid was submitted for the purpose of driving Broadway out of business. The answer denies also that Otis' facilities fail to meet bid specifications, that it is illegal to enter into a contract with Otis and that making such a contract would be an abuse of discretion.

The answer alleges that the Otis' bid for warehousing and wholesale store space was "the lowest and best bid"; that awarding the bid to Otis instead of Broadway will effect a saving of $200,000 in the three-year life of the contract; and that on April 6, 1960 (five days prior to the filing of the petition on April 11, 1960), Otis was notified that its bid had been accepted. This was followed by a general denial and a prayer that the petition and temporary injunction be dismissed.

Perhaps at the outset it will be well to recall that the state of Ohio in creating the Department of Liquor Control in December 1933, in express language created a liquor monopoly of its own. The Act which created the department (115 Ohio Laws, Pt. 2, 118) is entitled:

"To provide a system of control of the manufacture and importation of and traffic in beer and intoxicating liquors in this state, *including a state monopoly of the distribution and sale of spirituous liquor*; for that purpose to create the Department of Liquor Control, to consist of the Board of Liquor Control and the Director of Liquor Control and define their respective powers and duties; * * *." (Emphasis added.)

The authority of the Department of Liquor Control to enter into leases for state liquor stores and warehouses arises in part from the provisions of Section 4301.10, Revised Code (128 Ohio Laws, 1282, 1285), which reads in part as follows:

"(A) The Department of Liquor Control shall:
"* * *

"(3) Put into operation, manage, and control a system of state liquor stores for the sale of spirituous liquor at retail and to holders of permits authorizing the sale of such liquor, and by means of such stores, and such * * *, warehouses, and other facilities as it deems expedient, establish *and maintain a*

*state monopoly of the distribution of such liquor and its sale in packages or containers*; * * * lease, or in any manner acquire the use of any land or building required for any such purposes; * * *.

"(B) The department may:

" * * *

"(2) Enter into leases and contracts of all descriptions within the scope of its functions * * *." (Emphasis added.)

The warehouse service in question will serve the Cleveland district, and whichever bidder is successful there will be only one such warehouse in the Cleveland district and all or substantially all the spirituous liquor in cases of the district will be received at one and only one warehouse in the Cleveland district.

The state has thus monopolized the handling, distribution and sale of spirituous liquor in packages or containers. It would appear therefore that, so far as the quantity, flow or movement of spirituous liquor in packages, approximately the same amount will be handled whether it be through Broadway's warehouse or through the Otis warehouse, and whether the initial charge for warehousing is $.1245, as bid by Broadway, or $.095 as bid by Otis, or whether the renewal charge is $.055, as bid by Broadway, or $.03, as bid by Otis.

The invitation for bids in this case called not only for warehouse service but also for a wholesale store. It should be pointed out that competitive bidding is required in the case of state liquor stores and all liquor store leases are required to be made "in writing with the lowest and best bidder" after publication of a legal advertisement, under the provisions of Section 4301.11 of the Revised Code. That section provides in part as follows:

"All contracts of lease for a state liquor store entered into by the Department of Liquor Control shall be made in writing with the lowest and best bidder after an advertisement in a newspaper of general circulation in the community wherein it is proposed to establish such store. In determining the lowest and best bid, the department shall consider the length of the lease, the location, size, character, and quality of the construction, and the general fitness for use as such store of the premises for which a bid is submitted."

As we view it, the mandate above set forth has equal force with the provisions contained in Chapter 1331, known as the

"Valentine Act." Being specific as to subject matter and a much more recent enactment, it would, in our opinion, prevail in the event of any conflict.

Plaintiff, in its notice as to evidence in this court, made reference to the bill of exceptions from the court below, the depositions of Bernard E. Woeste and a stipulation of counsel; while counsel for defendant in its notice made reference to evidence in the record of depositions, papers, stipulations and exhibits. The pleadings, entries, evidence, exhibits, depositions, briefs and oral arguments have been given careful attention and consideration.

It is only proper that we compliment counsel for plaintiff and defendant on the capable and thorough manner in which the oral and written arguments were presented. The issues in this case are unusual, and counsel have materially assisted the court with their research upon the many issues involved.

A great deal of plaintiff's case is founded upon the allegation that Otis' bid, both for initial charge and the renewal charge, was substantially below cost, was not competitive and was for the purpose of driving Broadway out of business. The issue presented by this allegation has to do with the cost in the three-year period beginning June 1, 1960, of rendering this service. We do not regard evidence or proof of what Otis charged in previous years as establishing Otis' costs during a three-year period on and after June 1, 1960. Likewise, we do do not believe that much significance can be attached to the fact or claim that Otis' charge to other customers was more than the amount of its bid in this case.

We do not recall any showing that the facts and circumstances with reference to these other customers and the state liquor department were identical, nor do we regard that as important. The only item to be handled by a warehouse under the proposed lease was spirituous liquor in bottles enclosed in cases. As a substantial portion of the liquid in each bottle was alcohol, we assume that keeping it warm while in storage was of minor importance, if any at all. Proof as to the heating cost in the case of spirituous liquor is of little concern. Likewise, the length of time a particular case is in the warehouse could affect in a substantial degree the cost to the warehouse. For example, if we assume that case A, an average case of spirituous liquor,

and case B, also an average case of spirituous liquor, are identical in every respect sofar as size, weight, handling and other factors are concerned, but that case A arrives and leaves the warehouse on the first day of the month, while case B arrives on the first day of the month and leaves on the last day, the great differential will become apparent. So far as the requirement for storage is concerned and omitting the difference of cost for handling, the warehouse during a month would receive thirty times as much in storage charges earned for space in the warehouse used by cases in and out in one day's time when compared to cases which remain in the warehouse for the full thirty-day period. It must be remembered that, both in the answer filed by the defendant and in the evidence submitted on behalf of the defendant, it was denied that Otis' bid was below cost. This is quite understandable in view of the testimony that during the preceding two years when Otis had none of the liquor storage business, a substantial part of its warehouse space was empty and earning nothing. Under such circumstances, Otis was compelled to allocate all its fixed charges to the business it had as well as expenses arising from the handling of the other business.

As before stated, the principal claim on which Broadway rests its case is that Otis' bid of 9.5 cents for initial storage and 3 cents for renewal storage is below cost. As we view the record, plaintiff has failed to produce a preponderance of the evidence that such is the case. Plaintiff has used the below-cost claim as the basis for its inferences that Otis and the others associated with it entered into an illegal conspiracy, that the bid submitted by Otis was monopolistic, predatory and unlawful and that the acceptance of this bid by Crouch would be an abuse of discretion. The failure of proof as to the primary fact obviously carries with it a failure of inferences arising therefrom.

Much emphasis was placed upon the conferences, telephone calls, meetings and discussions which were held in advance of and in preparation for the submission of the bid by Otis. Even if the bid was below cost, and we do not believe it was, plaintiff also would have the burden of showing that it was fixed at that figure for the purpose of driving plaintiff out of business.

Broadway got the Cleveland district warehouse and whole-sale store business in 1958 by underbidding Otis. Since losing

this business, Otis operated this warehouse at considerably under capacity. The record shows that Otis was aware of what happened in 1958 in the Canton district where the rate dropped sharply in 1958 and the initial rate per case, which had been 14 cents per case prior thereto, dropped to 10 cents per case in 1958, and the renewal storage, which had been 5½ cents per case prior to 1958, dropped to 4 cents per case. Thus it is not surprising that Otis in its bid dropped ½ cent per case below the initial rate at Canton and 1 cent per case below the renewal rate per case at Canton.

In the brief on behalf of defendant, many reasons are urged why the petition should be dismissed and the temporary injunction dissolved. Among these are the contention that plaintiff is not entitled to injunctive relief unless defendant either has abused his discretion or acted in a fraudulent manner (See *Canton Storage, Inc.*, v. *Moon, supra*); that defendant is under no duty to investigate and make determinations with respect to claimed violations of Chapter 1331, *supra*, known as the "Valentine Act"; that Chapter 1331, *supra*, does not apply to the state; that Otis' intent in submitting the bid in question was lawful and not below cost; and that there is no evidence of conspiracy, and proof of actions of the various corporate officers and employees does not show a conspiracy.

Without attempting to answer each of these questions we feel there are two fatal defects in addition to the matters set forth above which must be mentioned.

In the first place, the awarding of the contract had been made and notice of it given to Otis five days before this suit was filed. It is true that the transaction remains to be finalized, but it is plain that pursuant to advertisement an offer had been received and that offer was accepted prior to the filing of this suit. It is of course obvious that equity cannot enjoin that which has been accomplished, and the important fact was whether an offer had been made and accepted. No one disputes this, and this is another reason why the petition must fail.

The other and even more compelling reason is that Broadway has thoroughly litigated the rights of Otis and seeks an order which will deprive Otis of any of the benefits arising from the acceptance of Otis' offer, although Otis is nowhere a party to this case. The real parties in interest in this litigation are

Broadway and Otis. Nowhere in the petition or evidence is there any suggestion or claim that the director has been guilty of any dereliction, omission or fraud of any character whatsoever. If that be true, the proper party defendant would be Otis and such other corporations and individuals acting for them as plaintiff's evidence warranted, and there was no necessity whatsoever for even naming the director as a party defendant. This latter ground, in our opinion, is a further reason, and a compelling one, why the petition must be dismissed and the injunction dissolved.

In closing we wish to compliment Judge Reynolds of the Common Pleas Court for the careful and scholarly opinion he wrote in this case, which well expresses our ideas and which we will not repeat here.

*Petition dismissed.*

DUFFEY, P. J., concurs.

DUFFY, J., concurs in judgment.

DUFFEY, P. J., concurring. I concur in the determination that there is an omission of a necessary party, and that on the evidence the plaintiff has not proved a violation of the "Valentine Act." Section 1331.01 *et seq.*, Revised Code.

The plaintiff attacks the legality of certain acts of Gera Corporation and other individuals. On the assumption that this conduct is illegal, plaintiff then contends that it would be an abuse of discretion for a public official to enter into a contract which is the product of that illegal conduct. The appellant joined only the liquor director in this action.

The injury perpetrated or threatened here may be subject to injunctive action under the "Valentine Act." Assuming it is, plaintiff might also be entitled to join, and obtain ancillary relief against, the liquor director in order to afford a complete and meaningful remedy. However, in the present case, plaintiff has placed in issue the legality of Gera's actions without making Gera a party. A decision which would deny to the liquor director the right to enter into the proposed contract would obviously interfere with a substantial right of Gera. It would not, however, be binding on Gera. I, therefore, believe that the person alleged to be acting illegally is a necessary party to a complete determination of the controversy. Further, it should

be noted that plaintiff has here attempted to foist solely upon the director the obligation to defend the legality of the conduct of private third persons of which he and his department do not necessarily have personal knowledge. There is no claim of fraud or collusion on the part of the director. I do not believe that the courts should, as a matter of policy, place public officials in such a position when they are proposing to let a contract.

The question of necessary parties would not dispose of this suit. Sections 2307.26 and 2323.05, Revised Code. I, therefore, also concur in the finding that on the evidence plaintiff has not proved a violation of the "Valentine Act."

It is apparent on the evidence that Gera and its parent, Glen Alden, possessed the capacity to restrain competition. It is apparent also that there is a combination of capital and skill, and that overt acts have occurred. The principal question is, therefore, whether plaintiff has established an intent or purpose to unreasonably restrict trade or commerce. Section 1331.01 (B) (1), Revised Code.

Plaintiff contends (1) that the Otis division of Gera would in fact operate under the proposed contract at a loss; (2) that its management knows that a loss is reasonably anticipated over the three-year period of the contract; (3) that by so doing it will economically destroy the only present competitor and effectively deter prospective competitors who might otherwise enter this particular market; and (4) that these circumstances reasonably give rise to an inference that the purpose of the conduct is to unreasonably restrict trade in that market. Cf. *United States* v. *N. Y. Great Atlantic & Pacific Tea Co.*, 67 F. Supp., 626 (E. D. Ill., 1946), affirmed 173 F. (2d), 79 (C. C. A., 7—1949), and the discussion by Carl H. Fulda, "Food Distribution in the United States," 99 Univ. of Pa. Law Review, 1051 (1951).

This evidentiary and economic theory of plaintiff is open to doubt. However, assuming the validity of the theory, the plaintiff must establish the first essential fact of its theory, *i. e.*, that the bid of Gera would result in a loss. To sustain plaintiff's evidentiary theory, "loss" should here mean revenue below operating cost. The existence of revenue in excess of that cost would make any inference of illegal purpose more difficult to justify.

Without Otis' financial statements, there would be no evidence from which any loss could be reasonably determined.

Plaintiff does not and, having itself placed them in evidence, cannot deny that these statements were prepared from the actual books of account and records of the Otis division of Gera. No attempt was made by plaintiff to go behind these book figures and prove actual costs. An examination of the statements graphically demonstrates the inadequacy of plaintiff's case. Two appendixes appear at the conclusion of this concurring opinion. Appendix No. 1 is a comparison of income and expense figures of the Otis division for the years 1956-1957 (when Otis had the liquor contract), 1958-1959 (when the plaintiff had the liquor contract), and the "pro forma" figures for the year 1960 prepared by the Otis division and based upon anticipated income and related expenses (offered by the defendant). This comparison shows that, based on the figures submitted, the Otis division reasonably anticipated a net profit per year, with the liquor contract, of $75,640, or a 13.2 per cent profit on sales.

Appendix No. 2 is an analysis of Otis' income and related expenses for a projected year. In making this analysis, specific volumes, rates and amounts were used where known or computable. Where unknown or subject only to estimate, the *only* available figures in the record were used. Otis division's projected net operating profit ($75,640) shown in the comparison statement, and that found by the analysis in appendix No. 2 ($72,077.88), differs only by $3,562.12—a relatively nominal amount.

Upon the evidence submitted the inescapable conclusion is that the Otis division may reasonably anticipate a most fair margin of profit.

Plaintiff might have used other methods to prove that the cost would exceed the corresponding revenues. But appellant offered these financial statements as part of its evidence. Having done so, it must be bound by what is reasonably implied from them. They established that Gera could have had a legitimate profit motive in making the bid. Thus, on the facts proved, the entire evidentiary theory of plaintiff falls.

The letter of Otis to the liquor director, October 23, 1953, relates to the purported increase in costs over a prior ten-year period. This evidence is too remote to be of value. It is certainly not decisive. There is much in the record to indicate that the state has for many years been the victim of the noncompetitive conditions in the Cleveland area, and that exorbitant rates

for liquor handling and storage may have been charged: However, the existence of a "gravy train" does not raise an inference of a loss under the proposed contract.

There being no proof that the bid price would be a deliberately losing proposition, the plaintiff has failed to establish its own legal and evidentiary theory, and the judgment must be for the defendant.

## APPENDIX No. 1

### Comparison Statement

| | | Actual | | | Pro Forma 1960 |
|---|---|---|---|---|---|
| | | with liquor bus. | | without liquor bus. | |
| | | 1956 | 1957 | 1958 | 1959 | |
| **OPERAT. INCOME** | | | | | | |
| Handling | | $244378.57 | $193966.70 | $ 91375.67 | $ 63712.75 | $180842.00 |
| Storage | | 363141.60 | 442961.22 | 315089.51 | 230495.16 | 360881.00 |
| Rental | | 79641.00 | 31096.00 | 26155.00 | 22556.00 | 30956.00 |
| Tot. Oper. Inc. | | $687161.17 | $668023.92 | $432620.18 | $316763.91 | $572679.00 |
| **OPERAT. EXP.** | | | | | | |
| Plant & Oper. | | $197105.29 | $195207.90 | $193450.08 | $168746.28 | $183782.00 (A) |
| Serv. & Maint. | | 35056.60 | 37538.17 | 45927.80 | 23183.09 | 21800.00 (B) |
| Plant Labor | | 222614.89 | 187286.04 | 114953.07 | 93398.42 | 201157.00 (C) |
| Total | | $454776.78 | $420032.11 | $354330.95 | $285327.79 | $406739.00 |
| **GR. OPER. PROF.** | | $232384.39 | $247991.81 | $ 78289.23 | $ 31436.12 | $165940.00 |
| % to Sales | | 33.8% | 37.1% | 18.1% | 9.9% | 29.0% |
| **GEN. & ADMIN.** | | $ 89678.03 | $ 93312.99 | $ 68909.11 | $ 47015.87 | $ 90300.00 (C) |
| **NET OPER. PROF. (LOSS)** | | $142706.36 | $154678.82 | $ 9380.12 | $(15579.75) | $75640.00 |
| % to Sales | | 20.8% | 23.1% | 2.2% | (4.9%) | 13.2% |

(A) The evidence shows a rental reduction of $14,757.00 in 1959 based upon a pre-existing 25-year lease containing an automatic reduction clause

on a sliding scale every 5 years. No dispute exists of record as to the fairness of this lease.

(B) This amount when analyzed by specific accounts shows the difference is primarily due to a $9,000.00 reduction in depreciation expense on maintenance and handling equipment, and no provision being made for supplies and handling equipment of approximately $2,500.00 in prior years.

(C) These amounts were not specifically analyzed by individual accounts.

## Appendix No. 2

### Analysis for a Projected Year.

OPERATING INCOME

| | | | |
|---|---|---|---|
| Liquor—State of Ohio: | (A) | | |
| Handling & 1 mo. stor: | | | |
| 4,435,020 cases ÷ 3 yrs. @ .095 | $140442.30 | | |
| Renewal Storage: | | | |
| 4,224,444 cases ÷ 3 yrs. @ .03 | 42244.44 | | |
| Rental of Wholesale Store: | | | |
| 12,854 sq. ft. @ .0575 | 8869.26 | | |
| Total liquor income—State | | $191556.00 | |
| Liquor—Distillers | (B) | 60796.88 | |
| Total liquor income | | $252352.88 | |
| Non-Liquor Revenues | | | |
| Tenant & Merchandise | (C) | 316764.00 | |
| Total Income | (D) | | $569116.88 |
| | | | |
| OPERATING EXPENSES | (E) | | |
| Plant & Operating | | $183782.00 | |
| Service & Maintenance | | 21800.00 | |
| Plant Labor | | 201157.00 | |
| General & Administrative | | 90300.00 | |
| Total operating expenses | | | $497039.00 |
| Net operating profit | | | 72077.88 |
| OTHER INCOME & EXPENSE | (F) | | 6725.00 |
| NET PROFIT before Federal Taxes | | | $ 65352.88 |

44

(A) Based upon the volume figures of John R. Slocum, Chief of the Voucher Section, Division of Accounting, Department of Liquor Control. Rates based upon bid figures of Otis.

(B) Based upon appellant's Exhibit No. 1, showing revenue figures from distillers for year 1957 (Otis' latest year of receiving such revenues).

(C) Based upon appellee's Exhibit 6 & C, showing latest years other revenue which did not include any liquor income.

(D) Appellee's Exhibit C shows projected income from all sources to be $572,679.00, or a net difference of only $3,562.12.

(E) Based upon appellee's Exhibit C showing projected expenses for year 1960. Comparison of expenses for years 1956-1959 inclusive, shows uniformity and gives additional weight to the projected figures.

(F) Based upon appellee's Exhibit C, non-operating expenses are relatively small and the necessity of adjusting for such items is argumentative, particularly for the purposes herein used.